# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| QT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 05 C 6387 |
| | ) | |
| MAYO CLINIC JACKSONVILLE, MAYO | ) | Judge James B. Moran |
| CLINIC ROCHESTER, MAYO FOUNDATION, | ) | |
| MAYO CLINIC COLLEGE OF MEDICINE, AND | ) | Magistrate Judge |
| ROBERT L. BRATTON, M.D. | ) | Geraldine Soat Brown |
| | ) | |
| Defendants. | ) | |

## MAYO'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Peter B. Bensinger, Jr. (Id # 6217347)
J. Scott McBride (Id # 6277988)
**BARTLIT BECK HERMAN PALENCHAR**
  **& SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL  60610
Firm I.D. No. 31210
Telephone:      (312) 494-4400
Facsimile:       (312) 494-4440
E-mail:           peter.bensinger@bartlit-beck.com
                     scott.mcbride@bartlit-beck.com

*Attorneys for Defendants Mayo Clinic Jacksonville,*
*Mayo Clinic Rochester, Mayo Foundation, Mayo Clinic*
*College of Medicine, and Robert L. Bratton, M.D.*

TABLE OF CONTENTS

Introduction...................................................................................................................1

Factual Background ......................................................................................................1

Argument ......................................................................................................................9

I.      The First Amendment Protects The Mayo Article................................................9

        A.      The First Amendment Applies To Mayo's Clinical Study Results ........................9

        B.      The First Amendment Applies To QT's Negligence Claims................................10

II.     Mayo's Clinical Study Results Concerning The Q-Ray Are Protected
        Speech Because QT Is A Limited Public Figure .................................................11

        A.      QT's Extensive Marketing Of Pain Relief Claims Makes QT A
                Limited Public Figure ............................................................................12

        B.      QT's Use Of Product Testing To Support Its Marketing Claims Of
                Pain Relief Makes QT A Public Figure With Respect To Those
                Claims 13

        C.      QT's Pain Relief Claims Generated A Public Controversy Before
                Mayo Published Its Study Results ........................................................14

III.    The Court Should Dismiss QT's Negligence Claims .......................................15

Conclusion ...................................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Bose Corp. v. Consumers Union*,
508 F. Supp. 1249 (D. Mass. 1981) .......................................................................... 9, 10, 13, 14

*Cowras v. Hard Copy*,
56 F. Supp. 2d 207 (D. Conn. 1999) ....................................................................... 11

*Dairy Stores, Inc. v. Sentinel Publ'g Co.*,
516 A.2d 220 (N.J. 1986) ....................................................................................... 10

*Desnick v. American Broad. Cos., Inc.*,
44 F.3d 1345 (7th Cir. 1995) .................................................................................. 11

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ........................................................................................... 10, 11

*Isuzu Motors Ltd. v. Consumers Union*,
66 F. Supp. 2d 1117 (C.D. Cal. 1999) ................................................................... 13

*Kessler v. Zekman*,
620 N.E.2d 1249 (Ill. App. Ct. 1993) ..................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................. 9

*Mile Marker, Inc. v. Petersen Publ'g, LLC*,
811 So. 2d 841 (Fl. Dist. Ct. App. 2002) ..................................................... 10, 13, 14

*Nat'l Found. for Cancer Research v. Council of Better Bus. Bureaus*,
705 F.2d 98 (4th Cir. 1983) .................................................................................... 14

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............................................................................................... 15

*Quantum Elecs. Corp. v. Consumers Union*,
881 F. Supp. 753 (D.R.I. 1995) ........................................................................... 9, 12

*Simmons Ford, Inc. v. Consumers Union*,
516 F. Supp. 742 (S.D.N.Y. 1981) ........................................................................... 9

*Smith v. Ball State Univ.*,
295 F.3d 763 (7th Cir. 2002) .................................................................................... 9

*Steaks Unlimited, Inc. v. Deaner*,
623 F.2d 264 (3d Cir. 1980) ................................................................................... 13

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
    738 F. Supp. 1499 (D.S.C. 1989)........................................................................................... 12

*X-Tra Art, Inc. v. Consumers Union*,
    No. 93-16571, 1995 U.S. App. LEXIS 4685 (9th Cir. March 8, 1995)............................... 9, 11

**Rules**

Fed. R. Civ. P. 56(c) ...................................................................................................................... 9

## INTRODUCTION

Defendants ask this Court to dismiss two negligence counts from QT's complaint because an "actual malice" standard applies. QT alleges Mayo is liable for publication of clinical research results about QT's product: the Q-Ray Ionized Bracelet. The First Amendment, however, protects Mayo's non-commercial publication of clinical research results on an issue of public health and regarding a limited public figure (*i.e.,* QT). Mayo can only be liable for any allegedly false statements about the Q-Ray under an "actual malice" standard of proof; a negligence theory cannot support liability for Mayo's protected speech. The Court should dismiss QT's Count Six (Negligence) and Count Seven (Negligent Misrepresentation).

## FACTUAL BACKGROUND

### QT, Inc. and the Q-Ray Ionized Bracelet

QT is the nationally and internationally known distributor of the Q-Ray Ionized Bracelet ("Q-Ray"), which QT has sold in the United States since approximately 1996. (QT Compl. ¶ 17, set forth at Exhibit 1 to the accompanying declaration of J. Scott McBride ("McBride Decl.").) QT's founder and President, Que Te "Andrew" Park, discovered the Q-Ray on a 1993 trip to Spain, when it allegedly cured his lower back pain and his wife's migraines. (08/02/2004 Andrew Park Dep., *FTC v. QT, Inc.*, at 25:16-26:13, McBride Decl. Ex. 2.)

From the beginning, QT marketed the Q-Ray with claims it could relieve pain. (*See* 06/13/2006 Andrew Park Testimony, *FTC v. QT, Inc.* Trial, Volume 3A at 531:21-532:2, McBride Decl. Ex. 3; 05/19/2003 Ciprian Dep., *Casey v. QT, Inc.*, at 163:11-23, McBride Decl. Ex. 4; *see also* 07/20/2006 Aff. of Charles Chang Park in Supp. of Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., *Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, at ¶ 10, McBride Decl. Ex. 5 ("A primary [target group for QT's marketing] is senior citizens, who often have to deal with or manage pain and may want to use the bracelet to feel better.").) In 1998, QT marketed the Q-Ray at trade shows as a "natural and nonmedical approach for pains and aches." (05/21/2001 Ciprian Dep., *Consumer Justice Ctr. v. QT, Inc.*, at 85:11-86:8, McBride Decl. Ex. 6.)

**QT's Infomercial Campaign**

Starting in September 2000, QT expanded its marketing to include thirty-minute television infomercials. (Memorandum Opinion, *FTC v. QT, Inc.* ("FTC Opinion"), at 11, McBride Decl. Ex. 38; 05/06/2003 Andrew Park Dep., *Casey v. QT, Inc.*, at 32:19-24, McBride Decl. Ex. 7.) From September of 2000 through October of 2002, QT aired three infomercials on over 400 cable channels. (*See* Infomercial Monitoring Services ("IMS"), New Show Breakout 1-3, McBride Decl. Ex. 9; *see also* IMS Description, McBride Decl. Ex. 10 (describing IMS's monitoring services); 05/19/2003 Andrew Park Dep., *Casey v. QT, Inc.*, at 218:18-219:13, McBride Decl. Ex. 11.) QT's infomercials marketed the Q-Ray to people suffering from pain with claims that Q-Ray could relieve that pain. (FTC Opinion 134-35, McBride Decl. Ex. 38 ("The Q-Ray bracelet was marketed principally by means of infomercials with a clear message conveyed to viewers that the Q-Ray bracelet provides immediate, significant or complete pain relief."); *see also id.* at 17, 33, 106 (same).)

QT aired its first infomercial in September 2000 ("September 2000 Infomercial"). (*See* IMS New Show Breakout 1, McBride Decl. Ex. 9). Four times during the infomercial, the Host or a voice-over announcer explain that the Q-Ray removes excess positive ions from the body, restoring electrical balance and reducing or decreasing pain. (September 2000 Infomercial at 4:16-22, 9:3-8, 17:9-14, 26:3-8, McBride Decl. Exs. 12, 13[1] (*see example screen-capture with associated transcript text to the right*).) The infomercial



4:19 The Q-Ray Ionized Bracelet is
4:20 designed to restore the body to its normal
4:21 electrical balance the natural way, thereby
4:22 reducing pain and increasing energy.

introduces pharmacist Steve Hospodavis (at one minute, eleven seconds), who later also explains that Q-Ray relieves pain through removal of excess positive ions. (*Id.* at 29:1-7.) Three times during the infomercial the announcer encourages viewers suffering from pain to call now and try Q-Ray because "[y]ou have nothing to lose but pain." (*Id.* at 9:17, 17:23, 26:17.) Throughout the September 2000 Infomercial, QT shows numerous clips of individuals offering testimonials that the Q-Ray relieved their pain.

---

[1] All infomercial page and line citations are to the video transcript, located as an exhibit immediately following the video exhibit. For the Court's convenience, infomercial citations will note the exhibit numbers for both the video and transcript, respectively.

QT aired a second thirty-minute infomercial for the Q-Ray beginning in December 2001 ("December 2001 Infomercial"). (*See* IMS New Show Breakout 2, McBride Decl. Ex. 9.) The



infomercial Host describes Q-Ray as "the answer" for people who "struggle with daily life pain." (December 2001 Infomercial at 4:2-5, McBride Decl. Ex. 14, 15.) Less than three minutes into the infomercial, the Host introduces Dr. Jeremy Cole (*shown in the screen-capture to the right*), dressed in a doctor's white lab coat, who explains to viewers that "[t]he way the Q-Ray Bracelet works is that it discharges the positive ions from the body, thus restoring the electrical balance of the body in order to relieve pain." (*Id.* at 4:8-15.) Throughout the thirty-minute infomercial, the Host and voice-over announcer encourage people suffering from pain to try Q-Ray, often adding that consumers have "nothing to lose but pain." (*Id.* at 10:2-7, 13:16-21, 22:7-12, 23:2-3, 27:2-3, 27:22-28:3, 28:16-17, 29:5-6.) As with the September 2000 Infomercial, the December 2001 Infomercial shows many individuals giving personal stories of successful pain relief using the Q-Ray bracelet.

Finally, QT aired a third thirty-minute Q-Ray infomercial beginning in late June 2002 ("June 2002 Infomercial"). (*See* IMS New Show Breakout 3, McBride Decl. Ex. 9.) In this infomercial, the Host explains that QT used 3,000 year-old science "to help create their ionized bracelet," and that QT designed the Q-Ray to "to reduce pain." (June 2002 Infomercial at 4:3-15, McBride Decl. Exs. 16, 17.) The voice-over announcer tells viewers twice more during the infomercial that Q-Ray is a device based on an "exclusive proprietary ionization process" that



helps "to reduce pain." (*Id.* at 11:9-22, 21:19-22:1.) Repeatedly, the Host and the announcer encourage people suffering from different types of pain (including neck pain, sinus pain, back pain, headaches, tendonitis, or soreness in the arms, wrists, knees, or feet) to try the Q-Ray. (*Id.* at 10:8-16 (*shown in screen capture to the right*), 21:7-13, 28:13-20, 30:19-31:5, 31:21-32:7, 33:1-6.) Personal testimonials to Q-Ray's efficacy surround the official Q-Ray spokesmen's sales pitches.

In the June 2002 Infomercial, QT used the results of third-party scientific testing of the
Q-Ray to support its claims of pain relief. (*Id.* at 14:20-16:15; FTC Opinion 37-39, McBride
Decl. Ex. 38 (discussing use of Christianson's testing in June 2002 Infomercial and concluding
that the "totality of the discussion [with Dr. Christianson] creates the net impression that tests
prove the Q-Ray bracelet relieves pain.").) QT paid Dr. James Christiansen $1000 to use infrared
imaging to test the Q-Ray's effect on inflammation related to lower back pain. (05/19/2003
Ciprian Dep. 62:20-63:24, McBride Decl. Ex. 4.) The Host introduces Dr. Christiansen's work in
the June 2002 Infomercial, stating that "[r]ecently, doctors put Q-Ray to the test to try to
determine what effect the Q-Ray Ionized Bracelet has on the human body." (June 2002
Infomercial at 14:20-22, McBride Decl. Exs. 16, 17.) Dr. Christiansen describes his test results
showing that the Q-Ray worked to decrease the patient's inflammation and pain:

> After five minutes with the Q-Ray bracelet on his wrist, you can see that the
> temperature has declined dramatically. Apparently, much less inflammation, and
> that decrease in temperature correlates very well with Mr. Oaks' indication that he
> feels much less pain in that area. *(see accompanying screen captures below)*



(*Id.* at 15:15-21.) As the Court in *FTC v. QT* concluded, "Dr. Christiansen makes clear that the
colors [relating to temperature and inflammation] displayed by the infrared imager are indicators
of pain." (FTC Opinion 38, McBride Decl. Ex. 38.) Dr. Christiansen assures viewers that his
machines are "[v]ery true and very accurate, very reliable." (June 2002 Infomercial at 16:12-15,
McBride Decl. Exs. 16, 17.)

QT invested a significant amount of money in its infomercial marketing of Q-Ray. In
total, QT has spent over $32,000,000 on television advertising for Q-Ray, accounting for half of
QT's total selling cost for Q-Ray. (07/20/2006 Charles Park Aff. ¶ 22, McBride Decl. Ex. 5;
6/12/2006 Andrew Park Testimony, *FTC v. QT, Inc.* Trial, Volume 2B at 383:22-384:4, McBride
Decl. Ex. 18.) Independent third-party media monitoring firm, Infomercial Monitoring Services

("IMS") tracks infomercial advertising and media costs on approximately forty major national cable channels. (IMS Description, McBride Decl. Ex. 10.) IMS tracked Q-Ray's national infomercial advertising campaign from 2000 through the present. In just the first ten months of 2002 (immediately prior to the Mayo study's publication), IMS calculated QT's cost for the Q-Ray infomercial advertising campaign on forty major national cable channels at over $7,000,000. (2002 Q-Ray National Cable Infomercial Detail Report, McBride Decl. Ex. 19.) This amount covers less than ten percent of the total number of cable channels on which QT aired its Q-Ray infomercials. (05/19/2003 Andrew Park Dep. at 218:18-219:13, McBride Decl. Ex. 11 (noting that QT broadcast its infomercials on over 400 cable channels in total).)

QT's infomercial expenditures bought large amounts of television air time. From April 14, 2001 to June 29, 2003, QT aired its infomercials over 42,000 times. (FTC Opinion 14, McBride Decl. Ex. 38.) In just the ten months prior to publication of Mayo's study, QT aired its Q-Ray infomercials over 1000 times on forty national cable channels. (2002 Q-Ray National Cable Infomercial Detail Report, McBride Decl. Ex. 19.)

QT's heavy investment in Q-Ray infomercials paid off. (FTC Opinion 1, McBride Decl. Ex. 38 ("The Q-Ray Ionized Bracelet . . . achieved tremendous commercial success through a series of 30-minute infomercials."); *see also id.* at 88 ("There was a substantial jump in sales of the Q-Ray bracelet after the infomercials started airing in 2000. . . .").) Although QT did not begin infomercial advertising until September 2000, infomercial-generated sales accounted for 65-70% of QT's revenue for 2000, and increased QT's direct sales to consumers by over 35-fold. (05/06/2003 Andrew Park Dep., 81:12-20, McBride Decl. Ex. 7; FTC Opinion 89, McBride Decl. Ex. 38 ("QT's gross sales direct to consumers in 2000 were $6,190,566, compared to $175,488 in 1999.").) QT's total revenues almost tripled from 2000 to 2001 and again from 2001 to 2002, and QT's infomercials generated the majority of those revenues. (10/24/2005 Andrew Park Testimony, *Casey v. QT, Inc.* Trial, Afternoon Session, at 15:18-20, 17:5-7, 18:18-20, McBride Decl. Ex. 20 (showing increase in QT's year-over-year revenues); 05/06/2003 Andrew Park Dep. 81:12-20, 84:7-10, 85:10-12, McBride Decl. Ex. 7.)

QT's infomercial claims generated public criticism. In December of 2000, the Consumer Justice Center, a non-profit corporation, sued QT, claiming that QT "carried out a large scale program of deceptive and misleading representations" regarding, *inter alia*, the Q-Ray's purported pain relieving qualities. (12/07/2000 Compl., *Consumer Justice Ctr. v. QT, Inc.*, at

¶¶ 7-8, 36 ("CJ Compl."), McBride Decl. Ex. 21.) In May 2003, the Federal Trade Commission sued QT, alleging that QT's infomercial claim of "relief from various types of pain" is "false or was not substantiated at the time the representation was made." (05/27/2003 Complaint, *FTC v. QT, Inc.*, at ¶¶ 19-20, McBride Decl. Ex. 35.) The FTC sued QT "because of the widely disseminated deceptive claims that are found in the Q-Ray infomercials." (07/11/2006 Closing Arguments, *FTC v. QT, Inc.* Trial, Volume 7A at 1246:23-25, McBride Decl. Ex. 36)

The controversy associated with QT's infomercial claims attracted media attention. In March 2001, the Chicago Tribune published an article detailing the criticism of QT's marketing claims. (Michael Higgins, *Bracelet-maker hit with suit*, Chicago Tribune, March 20, 2001, at Metro 1, McBride Decl. Ex. 22.) The Tribune described QT's marketing claims that the Q-Ray reduced an imbalance of ions, "relieving aches and soreness." (*Id.* at Metro 4.) The Tribune also quoted critics of QT's claims, including Dr. Richard Blonsky, a past president of the American Academy of Pain Medicine, who said QT's claims were "just not logical" because you "cannot put a bracelet on the outside [of your body] and expect it to pull something out of your system." (*Id.*) QT responded in the media to its critics. Andrew Park, the Tribune claimed, was "ready to defend his business." (*Id.* at Metro 1.) "I know my product is working," Mr. Park said to the Tribune. (*Id.*)

The public controversy about QT's infomercial claims continues to the present. In late August 2006, the Chicago Tribune published a front page, below-the-fold article on QT's infomercial claims and the FTC lawsuit. (Michael Higgins, *Placebo effect a key issue in trial over pain bracelet*, Chicago Tribune, August 23, 2006, at 1, McBride Decl. Ex. 37.) The Tribune described how "[Andrew] Park sold the Q-Ray bracelet for years through breathless infomercials that claimed it could relieve the pain of everything from arthritis to chemotherapy—sometimes instantly and miraculously, testimonials suggested." (*Id.*)

## Mayo Clinic

Mayo Clinic has operated as a non-profit medical practice since its founding almost 100 years ago. (*See, e.g.*, Mayo Clinic Rochester Registration, McBride Decl. Ex. 23.) Mayo's logo of three interlocking shields (*shown right*) embodies Mayo's tripartite mission: a commitment to excellence in patient care, medical research, and academic education. (*See* About Mayo  Clinic, http://www.mayoclinic.org/about-web/ (last visited Nov. 2, 2006), McBride Decl. Ex. 24;

What Is The Center For Patient Oriented Research, http://cancercenter.mayo.edu/mayo/research/ cpor/what.cfm (last visited Nov. 20, 2006), McBride Decl. Ex. 25.) A core principle of Mayo is to serve as a reliable and dependable source of health information to the public. (*See* About Mayo Clinic, http://www.mayoclinic.org/about-web/, McBride Decl. Ex. 24; Mayo's Mission, http://www.mayoclinic.org/about/missionvalues.html (last visited Nov. 2, 2006), McBride Decl. Ex. 26.) Mayo emphasizes this core principal by encouraging clinical research on public health issues that will improve patient care and benefit society. (*Id.*)

**The Ionized Bracelet Study**

In 1999, Dr. Robert Bratton, a doctor at Mayo Clinic Jacksonville, decided to study whether the Q-Ray bracelet was as effective as QT claimed at relieving pain. Dr. Bratton contacted QT about participating in a clinical research study of its bracelet's effectiveness at pain relief. QT agreed to participate and to provide both "ionized" bracelets and placebo control bracelets. (05/14/1999 Park Letter to Bratton, McBride Decl. Ex. 27.)

Mayo enrolled 610 patients in the Ionized Bracelet Study. Mayo gave each patient a treatment in the form of an unmarked bracelet that was either a true "ionized" bracelet, or an inactive placebo bracelet. Over 28 days, study patients reported pain levels in twelve areas of the body seven times: day 0 (enrollment), day 1, day 3, week 1, week, 2, week 3 and week 4. The patients then sent completed forms back to Mayo. (Robert L. Bratton *et al.*, *Effect of "Ionized" Wrist Bracelets on Musculoskeletal Pain: A Randomized, Double-Blind, Placebo-Controlled Trial*, 77 Mayo Clinic Proceedings 1139, 1165 (Nov. 2002), McBride Decl. Ex. 28.) Mayo compiled and analyzed the study results, and Dr. Bratton submitted a manuscript to *Mayo Clinic Proceedings* ("*Proceedings*").

*Proceedings* is a peer-reviewed, scholarly journal specializing in the practice of internal medicine. (*Proceedings* Home Page, http://www.mayoclinicproceedings.com/about.asp (last visited Nov. 2, 2006), McBride Decl. Ex. 29.) *Proceedings* publishes original articles dealing with, among other things, clinical research and basic science research. (*Id.*) *Proceedings's* "primary goal … is to serve as an educational instrument to enhance the practice of medicine." (*Mission Statement*, 81 Mayo Clinic Proceedings 997, 1002 (Aug. 2006), McBride Decl. Ex. 30.)

*Proceedings* published the results of the Mayo study in a November 2002 article entitled "Effect of 'Ionized' Wrist Bracelets on Musculoskeletal Pain: A Randomized, Double-Blind, Placebo-Controlled Trial." (Bratton *et al*., *supra*, at 1164-68, McBride Decl. Ex. 28.) The study

concluded that the "data showed significant improvement in pain scores in both groups, but no differences were observed between the group wearing the placebo bracelet and the group wearing the ionized bracelet." (*Id.* at 1164.) Although the article acknowledged that Mayo did not design the study to test the effectiveness of placebos, the results suggest that patients' subjective perception of pain relief from the bracelet was due to the placebo effect. (*Id.* at 1165.)

**Related Proceedings**

A class action suit, *Casey v. QT*, was filed in Cook County Circuit Court on January 21, 2003, claiming consumer fraud and false advertising. The Fall 2005 trial lasted three months in front of Judge Solganick, who concluded that the Q-Ray bracelet was a "scam:"

> [W]hat I really saw in this case was a great scam. . . . And the beauty of that scam was that people were told, well, it doesn't work for everybody. So if it doesn't work for you, well, you are one of the, you know, few percent that the bracelet does not relieve pain for. Beautiful scam.

(01/03/2006 *Casey v. QT, Inc.* Trial at 114:15-20, McBride Decl. Ex. 39.) Judge Solganick said he "believe[d] the actions of Q-Ray were in fact in violation of the [Illinois Consumer Fraud and Deceptive Practices Act]," but he ruled in favor of QT because the plaintiffs' class representatives failed to meet their burden of proof. (*Id.* at 123:24-124:7.)

On May 27, 2003, the Federal Trade Commission filed its suit against QT as described, *supra*, claiming false advertising in violation of the Federal Trade Commission Act. The court held a bench trial this past summer. On September 8, 2006, Magistrate Judge Denlow issued a 136 page opinion. Judge Denlow found that "[t]he Q-Ray bracelet was marketed as an 'ionized bracelet' as part of a scheme devised by Que Te Park and the corporate defendants … to defraud consumers out of millions of dollars by preying on their desire to find a simple solution to alleviate their physical pain." (FTC Opinion 13, McBride Decl. Ex. 38) Judge Denlow concluded that QT marketed the Q-Ray by infomercial with clear claims that it could relieve pain:

> The Q-Ray bracelet was marketed principally by means of infomercials with a clear message conveyed to viewers that the Q-Ray bracelet provides immediate, significant or complete pain relief. This claim lacks a scientific or medical basis. As a result, consumers were misled into buying the Q-Ray bracelet based on the deceptive and misleading ads. Defendants … are responsible for these violations.

(*Id.* at 134-35; *see also id. at* 17-22, 24-27, 29-34, 94, 104-106 (finding QT's marketing "convey[ed]," "claimed," "stress[ed]," "represented," "assert[ed]," "reaffirmed," "repeated,"

"reiterated," or "reinforced" claims that Q-Ray relieved pain).) Judge Denlow entered judgment against QT for $87,019,840. (Final Judgment Order, *FTC v. QT*, McBride Decl. Ex. 40.)

On November 8, 2005, QT filed this lawsuit against Mayo alleging, in part, Negligence and Negligent Misrepresentation. Specifically, QT claims that Mayo was "negligent" and "made negligent misrepresentations" by "publishing, communicating, or causing to be published or communicated, [Mayo's] false and misleading statements and clinical research results concerning the Q-Ray® Ionized Bracelet®." (QT Compl. ¶¶ 108, 113, McBride Decl. Ex. 1.)

## ARGUMENT

Summary judgment is proper when there is no genuine issue as to any material fact and, viewing all facts and drawing all inferences in favor of the nonmovant, the moving party is still entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002). If the record as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted). There is no genuine issue as to the material fact of the protected status of Mayo's "speech" about the Q-Ray bracelet.

## I.   THE FIRST AMENDMENT PROTECTS THE MAYO ARTICLE

### A.   The First Amendment Applies To Mayo's Clinical Study Results

QT's Negligence and Negligent Misrepresentation claims allege that Mayo's publication of its study results disparaged QT's Q-Ray bracelet. (QT Compl. ¶¶ 108, 113, McBride Decl. Ex. 1.) Courts routinely apply First Amendment protections to similar published speech that allegedly disparages a corporation's products or defames the corporation's reputation. *See, e.g.*, *X-Tra Art, Inc. v. Consumers Union*, No. 93-16571, 1995 U.S. App. LEXIS 4685 (9th Cir. March 8, 1995) (applying 1st Am. protection to product review that allegedly disparaged plaintiff's pressurized paint product); *Quantum Elecs. Corp. v. Consumers Union*, 881 F. Supp. 753 (D.R.I. 1995) (applying 1st Am. protection to unfavorable review that allegedly disparaged plaintiff's ozone air cleaner and defamed company); *Simmons Ford, Inc. v. Consumers Union*, 516 F. Supp. 742 (S.D.N.Y. 1981) (applying 1st Am. protection to unfavorable review of plaintiff's electric car that allegedly defamed company); *Bose Corp. v. Consumers Union*, 508 F. Supp. 1249 (D. Mass. 1981) (*rev'd on other grounds*) (applying 1st Am. protection to product review that allegedly disparaged plaintiff's stereo speakers); *Mile Marker, Inc. v. Petersen*

*Publ'g, LLC*, 811 So. 2d 841 (Fl. Dist. Ct. App. 2002) (applying 1st Am. protection to magazine article comparing plaintiff's hydraulic winch to electric winch that allegedly defamed company); *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 516 A.2d 220 (N.J. 1986) (applying 1st Am. protection to investigative article that allegedly disparaged bottled-water product and defamed company).

First Amendment protection is similarly appropriate in this case because the balance of interests at issue weighs in favor of the free flow of information from non-commercial, peer-reviewed, clinical research studies on issues of public health. As the court in *Bose Corp.* explained, the Supreme Court has sought to strike a balance between a plaintiff's interest in compensation for wrongful injury and the public's interest in maintaining an unhindered flow of free speech. *Bose Corp.*, 508 F. Supp. at 1270; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (describing the Court's pursuit of the "proper accommodation between [the] competing concerns" of a "need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury"). Disparaging speech deals with an alleged injury to a company's property interests—"an interest not nearly as significant" as the personal reputational interest at issue in classical defamation cases. *Bose Corp.*, 508 F. Supp. at 1270. On the other side, however, the interest in protecting the flow of free speech about a company's products is strong:

> The public's interest in obtaining information [about the quality and characteristics of consumer products] is perhaps even greater than the corresponding interest in personal defamation actions.... Information obtained from product commentators often relates to health or safety problems in consumer products.... It would be unfortunate indeed if the threat of product disparagement actions stifled the free flow of such information.

*Id.* at 1271.

The interest in protecting speech like Mayo's is even stronger than the interest in protecting consumer buying-guide information such as that in *Bose Corp.* Unlike *Bose Corp.*'s consumer product review, Mayo's speech communicated clinical research study results on issues of public health in a peer reviewed, scholarly journal. It would be "unfortunate indeed if the threat of [lawsuits] stifled the free flow of such information." *Id.* at 1271.

## B.    The First Amendment Applies To QT's Negligence Claims

The First Amendment's protection originates with the speech at issue, not the tort claim the plaintiff has asserted against that speech:

> [The 1st Amendment's] zone of protection is created by rules that limit media defendants' liability for defamatory publications. **These rules apply not only to**

> **defamation actions, but to all claims whose gravamen is the alleged injurious falsehood of a statement**. Thus, courts look behind the label of the cause of action to determine whether First Amendment protections apply.

*X-Tra Art, Inc.*, 1995 U.S. App. LEXIS 4685 at *5-6 (emphasis added, internal citations and quotations omitted) (finding 1st Am. protection applied to product disparagement action).

All of QT's claims against Mayo are based on the same "speech"—Mayo's Ionized Bracelet study results. (*See* QT Compl. at ¶¶ 63, 68, 76, 82, 95, and 108, McBride Decl. Ex. 1.) As discussed above, Mayo's study results are protected speech. (*See also, infra*, PART II.) Therefore, the First Amendment applies to Mayo's defense against **all** of QT's claims, including counts VI (Negligence) and VII (Negligent Misrepresentation). This means that QT must meet the same elevated level of proof (actual malice) to hold Mayo liable for that protected speech, no matter what type of claim QT asserts. *See Desnick v. American Broad. Cos., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995) (noting that protected speech is "entitled to all the safeguards with which the Supreme Court has surrounded liability for defamation…. regardless of the name of the tort"); *Cowras v. Hard Copy*, 56 F. Supp. 2d 207, 209-10 (D. Conn. 1999) (finding protected broadcast not subject to liability under the less-strict standard for the torts of intentional and negligent infliction of emotional distress); *X-Tra Art, Inc.*, 1995 U.S. App. LEXIS 4685 at *6-7 ("[A party] cannot evade the constitutional standard of liability by merely relabeling [its] cause of action"). QT's counts VI and VII cannot establish liability because they are based on an inadequate negligence standard of proof. Thus, the Court should dismiss these negligence counts.

## II.  MAYO'S CLINICAL STUDY RESULTS CONCERNING THE Q-RAY ARE PROTECTED SPEECH BECAUSE QT IS A LIMITED PUBLIC FIGURE

The First Amendment protects criticism of a public figure unless the criticism was made with "actual malice." *Gertz*, 418 U.S. at 342-43 ("[P]rotection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures."). If a plaintiff "voluntarily injects himself or is drawn into a particular public controversy [that plaintiff] thereby becomes a public figure" for that particular issue, *i.e.*, a limited public figure. *Id.* at 351.

Similarly, Mayo's clinical research results about the Q-Ray are protected speech because QT is a limited public figure regarding the efficacy of the Q-Ray in relieving pain.[2] When QT made pain relief claims central to its extensive infomercial campaign, QT created and injected itself into a public controversy about the Q-Ray bracelet's efficacy. This happened long before Mayo published its clinical study results.

**A.  QT's Extensive Marketing Of Pain Relief Claims Makes QT A Limited Public Figure**

A company's extensive marketing with an emphasis on claims about a product's qualities can make that company a limited public figure with respect to those claims because the marketing invites public comment and criticism of the claims. *Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1507 (D.S.C. 1989) (finding plaintiff who spent $660,000 in advertising over two years a limited public figure because "[t]hrough their extensive advertising, the plaintiffs engaged the public's attention and therefore, assumed the accompanying risk"); *Quantum Elecs. Corp.*, 881 F. Supp. at 765 (finding plaintiff a public figure because of, *inter alia*, its "pursuit of a marketing strategy that emphasizes the controversy" at issue in the defendant's allegedly disparaging product review).

QT's infomercials emphasized the pain-relieving qualities of the Q-Ray as a principal reason for consumers to purchase the bracelet.[3] The infomercials described how QT designed the Q-Ray to relieve pain, presented medical professionals to explain the way Q-Ray relieved pain, encouraged viewers suffering from pain to try Q-Ray, and offered numerous individuals' testimonials about how Q-Ray relieved their pain. (*See* FACTUAL BACKGROUND, *supra*, at 1-5; *see also concurrently filed* MAYO'S STATEMENT OF UNDISPUTED MATERIAL FACTS at ¶¶ 12-45.) QT's marketing emphasis on claims of Q-Ray's pain relieving qualities invited public comment and criticism, and makes QT a public figure with respect to those claims. *See, e.g.*, *Mile Marker,*

---

[2] Whether QT is a limited public figure is a question of law for the court, not a fact question for the jury. *Kessler v. Zekman*, 620 N.E.2d 1249, 1256 (Ill. App. Ct. 1993).

[3] The Court in *FTC v. QT* reviewed the Q-Ray infomercials in detail and concluded that the "Q-Ray bracelet was marketed principally by means of infomercials with a clear message conveyed to viewers that the Q-Ray bracelet provides immediate, significant or complete pain relief." (FTC Opinion 134-35, McBride Decl. Ex. 38.) The Court repeats this finding throughout its 136 page opinion. (*Id.* at 17-22, 24-27, 29-34, 94, 104-106 (finding that QT's marketing "convey[ed]," "claimed," "stress[ed]," "represented," "assert[ed]," "reaffirmed," "repeated," "reiterated," or "reinforced" claims that Q-Ray relieved pain).)

*Inc.*, 811 So. 2d at 846 (finding plaintiff a limited public figure because it "continuously pursued a marketing strategy that emphasized" the product comparison that was the subject of the allegedly disparaging article).

QT's infomercial campaign was extensive. QT spent millions to broadcast its infomercials to a wide audience. QT spent over $32,000,000 on television advertising for Q-Ray—over $7,000,000 alone for more than 1000 infomercial broadcasts on forty national cable channels in just the ten months immediately prior to Mayo's study publication. (07/20/2006 Charles Chang Park Aff. at ¶ 22, McBride Decl. Ex. 5; 2002 Q-Ray National Cable Infomercial Detail Report, McBride Decl. Ex. 19.) The Q-Ray infomercials were one of the fifteen most-frequently aired infomercials in the three months prior to Mayo's study publication. (2002 Q-Ray National Cable Infomercial Detail Report, McBride Decl. Ex. 19.) QT's extensive infomercial campaign makes QT a limited public figure with respect to its claims of pain relief. *See, e.g., Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 273-74 (3d Cir. 1980) (finding plaintiff's "intensive campaign" made it a limited public figure because "through its advertising blitz, Steaks invited public attention, comment, and criticism"); *Isuzu Motors Ltd. v. Consumers Union*, 66 F. Supp. 2d 1117, 1124 (C.D. Cal. 1999) ("Isuzu can be considered a public figure to the extent that it has been an active participant in the market for SUVs and, through its marketing and advertising, has made claims about the safety and performance of [its SUV]."); *Bose Corp.*, 508 F. Supp. at 1273 ("By creating a new design for [its speakers] and then emphasizing that unique design in its extensive promotional campaign, the plaintiff precipitated discussion about the relative merits of the [speakers] and other loudspeaker systems.").

**B.      QT's Use Of Product Testing To Support Its Marketing Claims Of Pain Relief Makes QT A Public Figure With Respect To Those Claims**

QT sought third-party testing of the Q-Ray from Dr. James Christiansen to bolster its marketing claims that the Q-Ray relieved pain. (05/19/2003 Ciprian Dep. at 62:20-63:24, McBride Decl. Ex. 4.) QT used Dr. Christiansen in its June 2002 Infomercial, where he presented his results showing less inflammation and pain after use of the Q-Ray.[4] (June 2002 Infomercial at 14:20-16:15, McBride Decl. Exs. 16, 17.) Soliciting third-party product testing of

---

[4] The Court in *FTC v. QT, Inc.* concluded that QT used Dr. Christiansen's test results (as well as others) in its infomercials to claim that "tests proved that the Q-Ray bracelet relieves pain." (FTC Opinion 37-42, McBride Decl. Ex. 38.)

Q-Ray and using those test results to further market the Q-Ray's pain relieving qualities invites others to evaluate and comment on the Q-Ray's pain relieving qualities. *See Bose Corp.*, 508 F. Supp. at 1273 (finding plaintiff a public figure concerning its product's performance because, *inter alia*, "the plaintiff also actively sought to have reviewers test and review [the product], and then incorporated such written reviews in its advertising brochures"); *Mile Marker, Inc.*, 811 So. 2d at 846 (finding plaintiff a public figure because, *inter alia*, "on numerous occasions, Mile Marker had sought, and obtained, independent product tests and reviews of its product"). QT's use of product testing in its marketing supports this Court finding QT a limited public figure.

### C.   QT's Pain Relief Claims Generated A Public Controversy Before Mayo Published Its Study Results

QT's infomercial claims of pain relief were successful in generating public attention and stimulating public controversy before Mayo published its study results. QT's infomercial campaign "spiked up" QT's sales five- to ten-fold in 2000 and accounted for a majority of its sales in 2001 and 2002, over which time QT's revenues increased almost 700%. (*See* 05/19/2003 Ciprian Dep. 43:21-44:10, McBride Decl. Ex. 4; 05/06/2003 Andrew Park Dep. 81:12-20, 84:7-10, 85:10-12, McBride Decl. Ex. 7; 10/24/2005 Andrew Park Testimony, *Casey v. QT, Inc.* Trial, Afternoon Session, at 15:18-20, 17:5-7, 18:18-20, McBride Decl. Ex. 20 (showing increase in QT's year-over-year revenues 2000-2002).) QT's success in attracting public attention to the Q-Ray through its marketing weighs in favor of this Court finding that QT is a public figure with respect to its pain relief claims. *Nat'l Found. for Cancer Research v. Council of Better Bus. Bureaus*, 705 F.2d 98, 101 (4th Cir. 1983) (affirming finding that plaintiff was public figure because the plaintiff "vigorously sought the public's attention, and succeeded to a substantial degree, as is reflected by the approximately $25,000,000 it raised in the past three years").

QT's marketing generated public criticism before Mayo published its study results in November 2002. In December 2000, the Consumer Justice Center sued QT alleging its infomercial claims of pain relief were part of a "large scale program of deceptive and misleading representations." (CJ Compl. ¶¶ 7-8, 36, McBride Decl. Ex. 21.) Soon after, the Chicago Tribune published an article describing both sides of the increasing public debate over whether the Q-Ray was as effective as QT claimed at relieving pain. (Higgins, *Bracelet-maker*, *supra*, at Metro 1, McBride Decl. Ex. 22.) QT joined the debate to defend its product. (*Id.* (noting that Andrew Park said he was "ready to defend his business").) "I know my product is working," Mr. Park said to

the Tribune. (*Id.*) Thus, before Mayo published the results of its study, QT was already a public figure active in an existing public controversy over its claims of pain relief. *See Isuzu Motors Ltd.*, 66 F. Supp. 2d at 1123 (finding plaintiff a public figure concerning the safety of its SUV because, *inter alia*, "Isuzu vigorously participated in public debate about the [SUV]'s safety"). Here, Mayo did not create the public controversy over QT's claims, but "simply added its voice to the chorus that was already discussing the merits" of the Q-Ray bracelet. *Bose Corp.*, 508 F. Supp. at 1273. That QT's marketing created a public controversy before publication of Mayo's study results is further evidence that QT is a limited public figure as to its pain relief claims.

## III.   THE COURT SHOULD DISMISS QT'S NEGLIGENCE CLAIMS

Because Mayo's commentary on the Q-Ray is protected speech concerning a limited public figure, QT can only establish liability for any allegedly false or misleading statement if QT can prove with clear and convincing evidence that Mayo acted with actual malice. Actual malice requires that QT show that Mayo actually knew the Ionized Bracelet study results were false, or in fact had a high degree of awareness of the study's probable falsity when Mayo published those results. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). Because QT's Negligence and Negligent Misrepresentation counts are based on a negligence standard, they cannot support liability for the speech at issue. Therefore, the Court should dismiss counts VI and VII of QT's complaint.

## CONCLUSION

For the foregoing reasons, the Court should grant Mayo's motion for partial summary judgment and dismiss QT's counts VI (Negligence) and VII (Negligent Misrepresentation).

November 22, 2006          Respectfully Submitted,

s/J. Scott McBride
Peter B. Bensinger (ID # 6217347)
J. Scott McBride (ID # 6277988)
**BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL  60610
Telephone:   (312) 494-4400
E-mail:        peter.bensinger@bartlit-beck.com
                  scott.mcbride@bartlit-beck.com
*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2006, a copy of the foregoing **MAYO'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** was filed electronically. Notice to this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular mail. Parties may access this filing through the Court's electronic filing system.

s/J. Scott McBride

Michael A. Ficaro
Ross E. Kimbarovsky
Dean J. Polales
Richard H. Tilghman IV
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602
Telephone:     312-977-4400
Facsimile:     312-977-4405
E-Mail:        maficaro@uhlaw.com
               rossk@uhlaw.com
               djpolales@uhlaw.com
               rhtilghman@uhlaw.com

*Attorneys for Plaintiff QT, Inc.*